**Gretchen CAOLA, Plaintiff,**

**v.**

**DELTA AIR LINES, INC., Delta Family Care Disability and Survivorship Plan, Defendants.**

**No. CIV. A. 97–40077–NMG.**

United States District Court, D. Massachusetts.

Feb. 3, 1999.

**48**

Chester V. Shea, III, Worcester, MA, for Plaintiff.

Christine J. Wichers, Choate, Hall & Stewart, Boston, MA, Wilfred J. Benoit, Jr., Goodwin, Procter & Hoar, Boston, MA, for Defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiff Gretchen Caola ("Caola"), a Massachusetts resident, brings this action against Defendants, Delta Air Lines, Inc. ("Delta"), and Delta Family Care Disability and Survivorship Plan ("the Delta Plan")(both referred to collectively as "Defendants"). Caola is seeking from the Delta Plan recovery of denied short-term disability ("STD") benefits, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) (count I). Caola brings additional claims against Delta for violation of maternity leave rights, pursuant to M.G.L. c. 149 § 105D (count II), and for intentional infliction of emotional distress and constructive discharge (count III). Pending before this Court is Defendants' motion for summary judgment under Fed.R.Civ.P. 56(c) on all claims brought by Caola.

## I. The Background Facts

### A. Caola's Employment by Delta

Caola was employed by Delta as a flight attendant from February 25, 1992, until her resignation on October 11, 1996. In the course of her employment, Caola held a "line," meaning that she was given a monthly schedule of trips based on seniority and on a bid submitted by her. Additionally, for any days on which she was not scheduled to work, Caola understood that she had the opportunity to "pick up" trips from other flight attendants.

In July, 1995, Caola was granted an eight-month unpaid Company Convenience Leave of Absence ("CCL") which was scheduled to run from September 1, 1995, through April 30, 1996. Accordingly, she began her unpaid CCL on September 1, 1995.

In the meantime, Caola's schedule in August, 1995, called for her to work approximately fourteen days between August 1 and August 24 and to be off for the remainder of the month. On August 11, however, she notified Delta she was suffering from diarrhea and would be absent from work. On August 24, 1995, Caola notified Delta that she was feeling better and was able to return to work, but she did not work any additional days in August. On August 30, 1995, Caola learned from her doctor that she was pregnant. The factual record is unclear as to whether her August sick leave was related to her pregnancy.

### B. The Delta Plan

The Delta Plan, an employee benefit plan established and maintained pursuant to ERISA, provides for both STD benefits and

long-term disability benefits to non-pilot Delta employees. On January 2, 1996, while still on her CCL, Caola applied for STD benefits under the Delta Plan in connection with her pregnancy for a 26-week period to commence January 20, 1996, the first day of her 27th week of pregnancy.[1] With her application, she submitted medical certification stating that she would be disabled from performing her job as a flight attendant on January 19, 1996, and that her expected delivery date was April 20, 1996.

On February 9, 1996, Delta informed Caola that, pursuant to Section 4.02 of the Delta Plan, her disability period had commenced on August 14, 1995, and that she would be paid for only three weeks of STD benefits beginning January 20, 1996, through the expiration of the 26-week STD period on February 11, 1996.[2] Delta further explained to Caola that the "Successive Disabilities" rule set forth in Section 4.06 of the Delta Plan precluded her from receiving her requested STD benefits because she failed to return to work between disability periods, as required by the Delta Plan.[3]

Caola appealed the decision regarding the extent of her available STD benefits to the Administrative Subcommittee ("the Subcommittee") and later to the Administrative Committee ("the Committee").[4] Caola's appeals were denied because, in a manner similar to that used by Delta, it was determined that Caola was ineligible for the STD benefits she requested.

## C. Caola's Maternity Leave

On March 28, 1997, Caola gave birth and began six weeks of unpaid post-partum recovery leave, pursuant to Delta's policy and Massachusetts law. Caola submitted 1) an extension request to increase her leave to eight weeks and 2) a request for a 90-day personal leave for breast-feeding for which she was eligible. Delta did not grant Caola's extension request because her physician's certification failed to specify what medical condition justified such an extension.[5] On May 14, 1996, Delta granted Caola's 90-day personal leave request and informed her that she was expected to return to work on August 7, 1996.

Later that month, Caola received a letter from Delta notifying her that she would be expected to attend retraining courses on August 5 and 6. Caola, protesting the denial of her request for a two-week extension, neither attended the training session nor returned to work on August 7. On August 9, 1996, her manager called to ask her to reschedule training as soon as possible. Subsequently,

1. Pursuant to Delta's pregnancy/childbirth leave policy for flight attendants, a pregnant flight attendant may be eligible for disability benefits at the beginning of her 27th week of pregnancy.

2. Section 4.02 of the Delta Plan provides as follows:

> An eligible Employee shall qualify for Short Term Disability benefits when disabled as a result of a demonstrable injury or disease (including mental or nervous disorders) or pregnancy which prevents the Employee from engaging in the Employee's customary occupation. The duration of the Short-Term Disability period is 26 weeks following the date the disability commenced .... During the period an Employee qualifies for Short Term Disability, [s]he shall be eligible to receive income benefits in an amount determined under Section 7.01; provided, however, such benefits shall commence on the later of the eighth day of disability or the cessation of Earnings, including sick leave or vacation, if taken, and provided further, any days for which the Employee receives Earnings (as salary, sick leave pay, accident pay

or otherwise) shall be counted in the period of Short-Term Disability.

3. Section 4.06 of the Delta Plan, entitled "Successive Disabilities", states that:

> [I]f at any time an Employee who qualifies for Short Term Disability ... no longer qualifies for such benefits, no further disability benefits for that disability shall be paid under the [Delta] Plan unless the Employee returns to work and performs [her] customary occupation on a full-time basis for at least two consecutive weeks. An Employee may, however, qualify for a new period of disability upon returning to work for one day, if such disability results from an entirely different or unrelated cause from the previous disability.

4. Under the Delta Plan's review procedure, the Administrative Subcommittee and Administrative Committee provide the first and second level of review, respectively.

5. Under Delta's policy, the normal six week "post-partum" leave may be extended based upon "a statement from [one's] physician giving explicit medical conditions requiring extension."

Caola failed to attend two training sessions scheduled by Delta on August 19 and August 26. She did not return to work as requested and tendered her resignation as of October 11, 1996.

## II. Analysis

### A. The Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery on file and affidavits "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant, however, may not rest upon mere allegation or denial of the pleadings. Fed.R.Civ.P. 56(e). The Court must view the record in the light most hospitable to the non-moving party and indulge all reasonable inferences in his favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993).

### B. Count I: Denial of STD Benefits

In count I of her complaint, Caola seeks recovery for 26 weeks of denied STD benefits under the Delta Plan commencing on January 20, 1996.[6] Caola alleges that she qualified for STD benefits during this time period because she was entering her 27th week of pregnancy and was no longer able to perform her customary occupation. She submitted a medical certification stating that she would be disabled from performing her job as a flight attendant on January 19, 1996 and that her expected delivery date was April 20, 1996.

Defendants' argument for summary judgment with respect to its decision to deny Caola benefits can be summarized as follows:

1) Section 4.02 of the Delta Plan, according to Defendants' interpretation, provides that an STD period commences with any period that an employee is receiving sick leave benefits from Delta;

2) Caola's August 1995 paid sick leave on account of her diarrhea condition rendered her "disabled" and thus commenced an STD period on August 11, 1995;[7]

3) because Caola failed to return to work when her "disability" period ended, the "Successive Disabilities" provision of the Delta Plan precluded Caola from being eligible for a successive STD period commencing January 20, 1996; and

4) the decision of its plan administrator regarding Caola's benefits was reasonable and is entitled to substantial judicial deference.

The Supreme Court has determined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefits plan gives the administrator or fiduciary discretionary authority to review eligibility for benefits or to construe the plan". *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where a clear discretionary grant is found, "*Firestone* and its progeny mandate a deferential arbitrary and capricious standard of judicial review". *Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 827 (1st Cir.1997)(internal quotation marks omitted); *See Diaz v. Seafarers International Union*, 13 F.3d 454 (1st Cir.1994)(employing arbitrary and capricious standard).

---

6. In her complaint, Caola asserts that "this action arises under [ERISA], 29 U.S.C. § 1140" and does not specifically refer to 29 U.S.C. § 1132(a)(1)(B). However, because it is apparent that count I asserts a claim for benefits under an ERISA plan, this court treats count I as a claim under § 1132(a)(1)(B).

7. Pursuant to Section 2.01(a) of the Delta Plan, an Employee on an approved Company Convenience Leave of Absence is not precluded from being eligible for the short-term disability benefits described in Section 4.02.

■ In this case, the Delta Plan is vested with discretionary authority to determine eligibility. Sections 12.01 and 12.02 of the Delta Plan provide that:

"the Administrative Committee [of the plan] shall have the broadest discretionary authority permitted under law in the exercise of all of its functions including...deciding questions of eligibility...and the right to benefits".[8]

■ Given that express discretionary grant, this court will, therefore, review the Delta Plan's decision under a deferential "arbitrary and capricious" standard. That standard precludes judicial review of the merits and enables courts to determine only whether 1) the Administrative Committee's decision was supported by reasonably sufficient evidence and 2) the plan's guidelines were properly applied. *See Recupero v. New England Tel. & Tel. Co.,* 118 F.3d at 820; *Doyle v. The Paul Revere Life Ins. Co.,* 144 F.3d 181, 184 (1st Cir.1998)(quoting *Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 109 (1st Cir.1997)). In the context of summary judgment, this deferential standard requires this court to determine whether a genuine issue of material fact exists as to whether the denial by the Delta Plan of STD benefits to Caola was arbitrary and capricious.

■ Although it is a close call in this case, Caola has demonstrated that there is a genuine issue of material fact with respect to the proper application of the Delta Plan guidelines and the sufficiency of the evidence in support of Delta Plan's decision. The parties disagree as to when Caola was "disabled." It is undisputed that Caola called in sick on August 11, 1995, and was on paid sick leave until August 24, 1995, when she notified Delta that she was ready to return to work. However, according to Caola, she was not "disabled" until her 27th week of pregnancy, January 20, 1996, on which date she applied for STD benefits. On the other hand, Defendants contend that Caola was "disabled" as of her August 11 sick leave, thus precluding her (by virtue of the Successive Disabilities policy) from collecting STD benefits for the 26 weeks following January 20, 1996.

With respect to this genuine fact dispute, the actions of the Delta Plan raise two unresolved issues:

First, in support of its decision to "back date" Caola's "disability" to August 1995, the Delta Plan interprets the language of Section 4.02 to mean that a STD period commences on the date on which an employee first receives sick leave benefits from Delta. That interpretation is not, however, apparent from the language of Section 4.02 (see *supra* Part I). Were this Court to take Delta Plan's reading of Section 4.02 to its logical conclusion, a STD benefits period would potentially commence whenever an employee received paid sick leave benefits from Delta, regardless of whether the employee herself sought to qualify for STD.

Second, as Caola points out, the Delta Plan fails to explain why, if Caola's disability period commenced on August 14, 1995 and continued through February 11, 1996, she only received benefits for the final three weeks of that 26–week period.[9]

These unresolved issues suggest that reasonable minds could differ as to whether the Delta Plan's denial of Caola's STD benefits was arbitrary and capricious. *See Kiley v. Travelers Indemnity Company of Rhode Island,* 853 F.Supp. 6 (D.Mass.1994)(denying insurer's summary judgment motion where fact issue existed as to whether insurer acted arbitrarily and capriciously in denying benefits to employee). Thus, summary judgment on Caola's STD claim will be denied.

### C. *Count II: Violation of Maternity Leave Rights*

In count II of her complaint, Caola alleges that Delta's failure to provide her with more than six weeks of post-partum leave consti-

---

8. *See* Defendants' Statement of Undisputed Facts, ¶ 11,12.

9. This court is aware that Caola does not seek recovery for STD benefits for that six-month time period. The Delta Plan's failure to pay benefits during that period is relevant, however, to the question of whether the Delta Plan's decision regarding Caola's request for benefits after January 20, 1996 was arbitrary and capricious.

tutes a violation of Massachusetts state law and of Delta's own maternity leave policy. As discussed below, the record of undisputed facts demonstrates that Caola's claims under Count II are without merit and that Delta is entitled to summary judgment on that Count.[10]

Under the policy, Caola claims that she was entitled to eight (rather than six) weeks of maternity leave, because she submitted a medical certification with her request for a two-week extension. Caola argues that, including the twelve weeks of personal leave she took, she was, therefore, entitled to a total of twenty weeks of leave, rather than the eighteen she actually received.

■ The factual record fails to sustain Caola's claim under the Delta policy. First, Delta's Pregnancy/Childbirth Leave of Absence guidelines ("PCLA guidelines") provide women with six weeks of maternity leave and only allow for a two-week extension where the "request for an extension is supported by a statement from the employee's physician giving the explicit medical condition requiring an extension." Although Caola did submit a statement from her physician with her request, the physician failed to cite any medical condition warranting the two-week extension. Furthermore, even if Caola was eligible for such an extension, the PCLA guidelines explicitly state that any subsequent personal leave would be reduced proportionately by the two-week extension, thus entitling Caola to no more than eighteen weeks of leave.

■ Caola unpersuasively argues that, Delta violated state maternity leave law by giving her only six rather than eight weeks of maternity leave. Caola's state law claim fails because it is premised on an incorrect reading of state maternity leave law. M.G.L. c. 149 § 105D states that "a full-time employee who is absent from such employment for a period *not exceeding eight weeks* for the purpose of giving birth . . . shall be restored to her previous position . . . ." (emphasis added). Thus, under Massachusetts law, the eight-week period serves as a ceiling rather

than a floor as Caola contends. Caola's claim lacks merit, therefore, as a matter of law because the six-week maternity leave she received does not violate the requirements of Massachusetts law. For the reasons stated, Defendants' motion for summary judgment with respect to Count II will be allowed.

### D. *Count III: Intentional Infliction of Emotional Distress and Constructive Discharge*

In count III of her complaint, Caola alleges that Delta's continued intentional harassment caused her to experience undue emotional and physical stress which resulted in her constructive discharge.

#### 1. *Intentional Infliction of Emotional Distress*

■ Caola claims that Delta's communications with her concerning her return to work and denial of STD benefits constitute harassment entitling her to damages for intentional infliction of emotional distress. To satisfy the requisite elements of such a claim, the alleged conduct must be "extreme and outrageous", "beyond all possible bounds of decency", and "utterly intolerable in a civilized society". *Agis v. Howard Johnson Co.,* 371 Mass. 140, 144–145, 355 N.E.2d 315 (1976).

■ The record of undisputed · facts discloses that the "harassment" of which Caola complains consisted of numerous phone calls and letters by Delta instructing her to return to work at the expiration of her leave. This Court concludes that, as a matter of law, Delta's communications with the plaintiff and the denial of benefits fail to constitute "extreme and outrageous" conduct sufficient to sustain a claim for intentional infliction of emotional distress.

#### 2. *Constructive Discharge*

■ With respect to her constructive discharge claim, Caola argues in effect that Delta forced her to resign by repeatedly

---

**10.** In her opposition memo, Caola appears to raise a potential claim under the FMLA, although she failed to make any such claim in her Complaint. Under the circumstances, this Court will refrain from addressing the merits of such a claim.

asking her to return to work.[11] To constitute a constructive discharge, an employer's action must have the purpose and effect of forcing the employee to quit. *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977). A trier of fact must be satisfied that conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. *Id.; Aviles–Martinez v. Monroig*, 963 F.2d 2, 6 (1st Cir.1992).

Here, the alleged harassment by Delta involved 1) repeated requests by her managers that she return to work and 2) disagreement with her interpretation of its leave of absence policies. No reasonable juror could conclude that Delta's efforts to encourage Caola to return to work could reasonably compel her to resign. Furthermore, there is nothing in the record to suggest that the manager's requests were motivated by anything other than a desire to have Caola return to work. For the reasons stated, Defendants' motion for summary judgment with respect to Count III will be ALLOWED.

### ORDER

For the foregoing reasons, Defendants' motion for summary judgment with respect to Count I is DENIED and, with respect to Counts II and III is ALLOWED.

**So ordered.**

---

11. It is unclear upon what statutory basis Caola's constructive discharge claim rests. Because the complaint references 29 U.S.C. § 1140, apparently, Caola is alleging that Delta forced her to resign for having asserted her right to appeal the decision to deny her STD benefits. In any event, state law claims asserted on a constructive discharge theory would be preempted by ERISA. *See Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).