**Frederick W. POLLINI and Pamela J. Pollini, Plaintiffs,**

v.

**RAYTHEON DISABILITY EMPLOYEE TRUST, The Trustees of Raytheon Disability Employee Trust and Metropolitan Life Insurance Company, Defendants.**

**No. 97–CV–12229 MEL.**

United States District Court, D. Massachusetts.

May 11, 1999.

Robert O. Berger, III, Boston, MA, for Plaintiffs.

Rita Gylys, Blue Cross/Blue Shield of Massachusetts, Jean M. Kelley, Edward William Murphy, Morrison, Mahoney & Miller, Boston, MA, for Defendants.

LASKER, District Judge.

Frederick W. Pollini and his wife, Pamela J. Pollini, sue Raytheon Company, Raytheon Disability Employee Trust, and Metropolitan Life Insurance Company. As to the Trust and MetLife defendants, Pollini seeks reinstatement of his Long Term Disability insurance benefits ("LTD") under the Raytheon Long Term Disability Benefits Plan (the "Plan"), an employee benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001–1461. Pollini also asserts various state common law and state and federal statutory claims against Raytheon arising from Raytheon's allegedly wrongful termination of his employment. Mrs. Pollini alleges loss of consortium against all three of the defendants. Defendants, MetLife and the Trust, move for summary judgment on Counts V, VI, and VII. Raytheon, in a separate motion, seeks partial summary judgment on the remaining counts. This opinion addresses only the motion filed by the Trust and MetLife. That motion is denied as to Counts V and VI and is otherwise granted.

## I.

On July 14, 1993, Pollini filed an application for LTD benefits with MetLife, Raytheon's claims administrator, and began receiving benefits shortly thereafter. However, on July 1, 1994, MetLife terminated his LTD benefits on the grounds that he was not "fully disabled."

Phase I of the Plan, which applies to the first two years of a disability, provides that LTD benefits are payable if the participant is "fully disabled." According to the Plan, a participant is "fully disabled" if he or she

"cannot perform the essential elements and substantially all of the duties of his or her job at Raytheon even with reasonable accommodation." (R. at 274). To prove eligibility for benefits, an applicant must furnish "satisfactory medical proof" that he is "fully disabled." (R. at 340). The Plan further provides that "all determinations of the Plan Administrator and Claims Administrator with respect to any matter within their assigned responsibilities ... shall be conclusive and binding on all persons unless it can be shown that the interpretation or determination was arbitrary and capricious."

In 1988, while working on his house, Pollini fell 15–20 feet from a scaffolding and suffered injuries to his lower back, left wrist, forearm and neck. As a result, he remained out of work and on disability leave for 20 months. In 1990, he returned to work at the instruction of Raytheon. However, on June 11, 1993, Pollini left his position at Raytheon as a design drafter/checker because of exacerbation of these injuries.

On July 14, 1993, Pollini applied for LTD benefits under the Plan. His claim for LTD benefits was based largely on the severe pain he was experiencing due to spasms in his lower back. In connection with Pollini's application, Dr. James E. Gaydos, D.O., his attending physician, completed an "Attending Physician's Statement of Disability" form regarding Pollini's injuries. Dr. Gaydos described the Pollini's symptoms as lower back spasms with pain in both legs. (R. at 1). Although Dr. Gaydos estimated Pollini could return to work in August, he also found that Pollini was "totally disabled," not only for his regular occupation but for all occupations. (R. at 1).

After Pollini began receiving LTD benefits, MetLife inquired into the severity of his physical condition. On August 19, 1993, Dr. Victor M. Parisien, M.D., an orthopaedic surgeon whom MetLife used as a consultant, performed an Independent Medical Examination ("IME") in which he found that Pollini "ha[d] quite a lot of limitation of movement of his back." (R. at 4). While Dr. Parisien considered Pollini "disabled from his work as a design drafting checker," he also concluded that Pollini "could perhaps do some light duty work with no prolonged sitting and no bending or lifting." (R. at 4–5).

On August 25, 1993, Dr. Gaydos completed an "Attending Physician's Supplementary Statement" in connection with Pollini's claim for LTD benefits. In this form, Dr. Gaydos described the nature of Pollini's illness as "chronic myofascial pain syndrome lumbar spine." (R. at 6). Additionally, he found that Pollini was "totally disabled from low back pain exacerbated by [his] long drive to work and [his] seating at work." (R. at 6).

By letter dated September 13, 1993, MetLife requested additional information from Dr. Gaydos concerning Pollini's injuries. In his response dated September 24, 1993, Dr. Gaydos, while conceding that he had not reviewed Dr. Parisien's report, characterized Pollini as "totally disabled." (R. at 12). He attributed the length of Pollini's disability to several factors, including his age, general state of deconditioning, a previous injury to his lower back, and the fact that he was diabetic. (R. at 12–13). Dr. Gaydos described Pollini as "unable to sit comfortably for more than 30 to 40 minutes at a time," and concluded that "a return to work at this time would compromise his recovery." (R. at 13). He suggested that Pollini undergo physical therapy for six to eight weeks and then "be re-evaluated for a possible return to work at that time." (R. at 13).

On February 9, 1994, Dr. Parisien re-examined Pollini and found that his condition had improved. Nevertheless, Dr. Parisien also concurred with Dr. Gaydos' observation that Pollini was "totally disabled from his customary work." (R. at 49). Dr. Parisien also noted that Pollini "still had some limitation in his range of motion," but that it was not of the consid-

erable degree he had observed in his September 1994 examination of Pollini.

In March 1994, Pollini, upon being referred by Dr. Gaydos, was examined by Dr. Richard Day, M.D., at the New England Rehabilitation Hospital of Portland. Dr. Day completed an "Initial Outpatient Rehabilitation Medicine Consultation" form dated March 14, 1994, which reported that Pollini's MRI:

> showed no herniations or bulges into neural canal ...; there were no disk herniations, significant bulges or other encroachments on neural structures ... [and] no evidence of compression fractures or their significant bone abnormalities.

(R. at 68). Nevertheless, Dr. Day's also observed that Pollini:

> had not received relief with chiropractic and osteopathic manipulation ... [and] also had no relief with physical therapy.

(R. at 68).

On June 28, 1994, Dr. Azadian, a Raytheon physician, extended Pollini's medical leave of absence until July 1, 1994. On July 14, 1994, at MetLife's request, Dr. Greene examined Pollini, reviewed his MRI results, and commented that Pollini had not attended a chronic pain program recommended to him. Dr. Greene's assessment of Pollini was that:

> [t]he patient presents a somewhat difficult diagnostic problem because his symptoms are obviously functionally exaggerated to a degree that is very difficult to assess objectively. I can only suggest chronic back strain, primarily low back....
>
> Under these circumstances, and with his present mental outlook, it is very questionable that he could be employed in any capacity at the present time.

(R. at 108–9).

On August 26, 1994, after reviewing Dr. Gaydos' report of September 24, 1993 and the IME completed by Dr. Greene, MetLife wrote to Pollini notifying him of the termination of his LTD benefits. The letter stated that in reviewing:

> all of the medical documentation contained in [Pollini's] file ... along with the information provided on the job duties of a Design Drafter/Checker, we feel that no objective information has been provided to support the subjective complaints of [l]ow [b]ack, shoulder, neck and wrist pain. Therefore we have no alternative but to terminate your claim effective July 1, 1994, the date your benefits were suspended.

(R. at 140). Pollini replied to Raytheon, by letter of September 9, 1994, requesting a review of his claim and giving MetLife permission to release all medical reports and IMEs to Dr. Gaydos, his primary care physician.

Upon review of the decision to terminate Pollini's LTD benefits, MetLife then solicited a further report from Dr. Gaydos. On August 31, 1994, Dr. Gaydos wrote to MetLife that:

> [i]t was [his] current opinion that Mr. Pollini still suffers from the effects of his exacerbated low back, neck and shoulder symptoms that took him out of work. I feel that he is not able to return to work at the present time.
>
> ... I do not feel it will be in the immediate future that Mr. Pollini will be able to return to work, but rather I feel that a period of six months should be observed for continued physical therapy, home stretching and evaluations by myself before he can be re-evaluated for a possible return to work at that time.

(R. at 141). On September 16, 1994, MetLife wrote Dr. Gaydos requesting narrative responses to six questions relating to Pollini's condition and the completion of an Attending Physician's Statement of Functional Capacity form based on the most recent examination. (R. at 147).

Dr. Gaydos submitted a report dated October 3, 1994 and completed the "Attending Physician's Statement of Functional Capacity." In responding to MetLife's

question regarding whether he concurred with Dr. Greene's findings, Dr. Gaydos stated that he agreed with Dr. Greene that Pollini experiences " 'some limitation' on standing and sitting" and that he "may require a change in position from sitting to standing during the day." However, citing his experience of observing and treating Pollini during the previous year, he emphasized his "strong feeling" that Pollini could not work daily or even half days. Moreover, he noted his disagreement with Dr. Greene's findings to the extent that they implied that Pollini "could assume any kind of cramped or unusual position reaching or twisting." In addition, Dr. Gaydos cautioned against exposing Pollini "to any climbing or to an exposure to falling requiring balance or to any position operating in a bending, stooping or squatting position or in a position where he would need to sit for long periods of time." He further explained that while "operating electrical equipment sounds benign," if it involved "any bending, lifting, twisting prolonged standing or sitting," it "would aggravate [Pollini's] chief complaint of chronic low back pain."

On November 8, 1994, MetLife, after reviewing Dr. Greene's IME and Dr. Gaydos' additional reports as well as a medical staff review and Pollini's job description, MetLife advised Pollini that it was upholding its previous termination of his LTD benefits. MetLife explained that:

> Based on all of the medical information submitted, including the October 3, 1994, and September 27, 1994, reports from your physician, Dr. James Gaydos, the July 19, 1994, independent medical examination report from Dr. John Greene, Board Certified Orthopedic Surgeon, our medical staff review, and your job description, we find that you are not disabled as defined above.

(R. at 172). Specifically, MetLife concluded that "there [was] no objective evidence that would prevent [Pollini] from performing [his] occupation." (R. at 172).

In a letter to MetLife dated April 18, 1995, Pollini requested a second review of his disability status. MetLife, on June 12, 1995, sent Pollini's files to Dr. Robert D. Petrie, M.D., of the National Medical Review, who examined Pollini's file. Dr. Petrie concluded, based on the reports he read of other doctors, that "there is insufficient evidence in this record to support a claim of total disability from any and all occupations for which the claimant is reasonably suited, based on education, training and experience, due to diagnosed condition of low back, neck and shoulder pain." MetLife also obtained a vocational assessment of Pollini done by Janet Walsh MS, CRC, who found "that Mr. Pollini had the ability to perform his job in July of 1994." On September 15, 1995, MetLife again citing the lack of objective evidence informed Pollini that it was upholding its previous termination of benefits.

On June 19, 1997, the Social Security Administration ("SSA") determined that Pollini was disabled as of June 11, 1993.

On September 12, 1997, Pollini brought this action seeking the reversal of the MetLife decision and a reinstatement of his LTD benefits.

## II.

Where a claims administrator is vested with discretionary authority to determine eligibility, as here, a court may overturn its decision only if it is unreasonable, or arbitrary and capricious. *See Recupero v. New England Tel. and Tel. Co.,* 118 F.3d 820, 822 (1st Cir.1997). "If the district court determines that the out-of-court decisions were arbitrary and capricious, the appropriate form of order is one remanding to the out-of-court decision maker for further proceedings to decide whether the claim or claims have merit." *Recupero,* 118 F.3d at 822; *see also Doe v. Travelers Ins. Co.,* 167 F.3d 53, 57 (1st Cir.1999).

Defendants Metlife and the Trust contend that the decision to terminate Pollini's benefits was supported by the record

and therefore was not arbitrary, capricious, or unreasonable. They stress that the plaintiff has the burden of providing satisfactory medical proof of full disability and contend that Pollini did not satisfy this burden. As support for their position, they emphasize that: (1) there was no objective medical evidence supporting Pollini's complaint that he could not perform the duties of his job; (2) Dr. Gaydos' report was based on subjective complaints of pain provided by Pollini; (3) Dr. Greene noted the lack of medical evidence supporting a finding of full or total disability; (4) the MRI report reviewed by Dr. Day indicated no disk herniations, no nerve root compromise, no bulges into the neural canal, no evidence of compression fractures or other significant bone abnormalities; (5) Dr. Allen and Dr. Azadian concluded that the plaintiff's medical records provided no objective evidence that Pollini was disabled from performing his usual job; and (6) although Dr. Gaydos, as Pollini's treating physician insisted Pollini was disabled, his conclusion was not binding.

Pollini counters that the decision made by the defendants to terminate his LTD benefits was arbitrary and capricious. He further claims that there is a factual conflict between the findings of MetLife and a later decision by the SSA which awarded him disability benefits.

■ There is merit to Pollini's contention that the termination of his LTD benefits was arbitrary and capricious. First, the record is replete with extensive medical evidence, both objective and subjective, that Pollini was experiencing severe pain and limitations of movement in his lower back and that a physical basis existed for this discomfort and limited mobility. For example, Dr. Gaydos found in his physical examination of Pollini, on September 24, 1993, "evidence of a chronic bilateral psoas muscle spasm," which he believed accounted for the pain Pollini was experiencing in his tail-bone and lower middle portions of his spine. Likewise, Dr. Parisien, upon physical examination of Pollini, concluded

in his February 15, 1994 report that Pollini experienced "considerable limitation of movement of his back and still had some limitation in his range of motion." Dr. Parisien also found that "the X-rays of [Pollini's] lumbar spine reveal[ed] disseminated intervertebral spinal hyperostosis (abnormal thickening of bone tissue between vertebrae in the spine) with anterior osteophyte (small bony outgrowths) formation, as well as lateral osteophyte formation." Similarly, Dr. Greene found "some moderate limitation of flexion with essentially normal extension, with moderate limitation of right lateral rotation and normal left lateral rotation with moderate limitation of lateral tilts." Dr. Greene also noticed "rather unusual anterior disk bulges at L 1–2–3, but no evidence of posterior disk problems at any level," in the MRI study Pollini brought to this examination.

Second, while each of the various doctors' reports expressed some limitations in their views in connection with Mr. Pollini's alleged disability, the administrator's rejection of the claim solely on the basis of a purported lack of objective evidence is troubling and questionable. MetLife cites *Pokol v. E.I. DuPont de Nemours & Co., Inc.*, 963 F.Supp. 1361, 1372 (D.N.J.1997), for the proposition that where (as here) the plan requires an applicant to provide "satisfactory medical evidence" to support his claim, "interpreting the language 'satisfactory medical evidence' to include 'objective medical evidence' is neither irrational or unreasonable." There is no reason to quarrel with the *Pokol* holding. However, that decision does not compel the further conclusion that a claims administrator did not abuse its discretion in terminating a claim which is supported by significant non-objective evidence.

Moreover, even though subjective evidence is arguably less dependable than objective evidence, a doctor's assessment of pain is not insignificant medical testimony. For example, in considering whether a person is "disabled" within the meaning of the Social Security Act, the SSA consid-

ers pain a significant non-exertional impairment. *See Nguyen v. Chater,* 172 F.3d 31 (1st Cir.1999). Indeed, a pervasive theme throughout the various reports and forms completed by the numerous doctors who examined Pollini was the severe pain he was experiencing and the resulting limitations of movement. The doctors who examined Pollini before the termination of his benefits as well as those who examined him subsequently during the review process all agreed that Pollini was experiencing pain directly attributable to his injuries. Those who suffer from pain caused by injuries as severe as Pollini's may clearly be incapacitated by the existence of such pain. It was unreasonable to ignore the assessments of pain made by these several trained medical professionals. MetLife abused its discretion in determining that Mr. Pollini was not "fully disabled" and therefore not entitled to LTD benefits.

■ On the other hand, Pollini's argument that MetLife erred by not considering the SSA's final determination that he was disabled is without merit. While a SSA determination of disability is generally relevant to a claims administrator's decision making but not binding, *see Gentile v. John Hancock Mutual Life Ins. Co.,* 951 F.Supp. 284, 288 (D.Mass.1997), the SSA's determination in this case is irrelevant. The administrator's decision to terminate Mr. Pollini's benefits occurred in 1994, three years before the SSA's determination that he was disabled. Moreover, the SSA's decision was based on the definition of "disability" contained in the Social Security Act; not the definition found in the Plan, which was used to make the decision at issue in this case. Moreover, in determining whether MetLife's denial of benefits was an abuse of discretion, the only record this Court may examine is the record that was before MetLife. The SSA decision is not part of that record.

Furthermore, to the extent that Pollini suggests that he is "totally disabled" and therefore is entitled to LTD under Phase II of the Plan, the Court is without juris-diction. In the present case, Pollini has not filed an application for LTD benefits based on the heightened "total disability" standard and the claims administrator has not issued a determination denying such benefits. Accordingly, the Court lacks jurisdiction of such a claim.

■ Finally, Mrs. Pollini's loss of consortium claim against MetLife and the Trust is preempted by ERISA. It is undisputed that the Raytheon plan is an "employee benefit plan" as defined by ERISA. 29 U.S.C. § 1002(3). Mrs. Pollini's claim is based upon the Trust and MetLife's alleged wrongful denial of benefits to her husband under the Plan. Therefore, her loss of consortium claim "relates to" an employee benefit plan within the meaning of ERISA, 29 U.S.C. § 1144(a).

### III.

The motion for summary judgment by MetLife and the Trust is denied as to Counts V and VI. The motion for summary judgment dismissing the consortium claim is granted. In light of this opinion, a motion for summary judgment by the plaintiffs remanding the case to the administrator for reconsideration may be appropriate.

It is so ordered.